**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CODY BROWN**, *individually and behalf of all others similarly situated*, | **CIVIL ACTION** |
| Plaintiffs, | **NO. 22-1097-KSM** |
| *v.* | |
| **KADENCE INTERNATIONAL, INC.,** | |
| Defendant. | |

**<u>MEMORANDUM</u>**

**MARSTON, J.**                                                    **March 23, 2023**

Plaintiff Cody Brown was employed as a Marking Helper and Support Assistant by Defendant Kadence International, Inc. ("Kadence"). (Doc. No. 1.) Plaintiff alleges that Kadence misclassified him and his coworkers as independent contractors, resulting in the denial of overtime compensation. (*Id.*) He brings this lawsuit, individually and on behalf of others similarly situated, alleging that Defendant's failure to pay appropriate overtime compensation violated the Fair Labor Standards Act ("FLSA") and, for those employees working in the Commonwealth of Pennsylvania, Pennsylvania's Minimum Wage Act ("PMWA"). (*Id.*) Presently before the Court is Plaintiff's "Unopposed Motion for an Order Certifying the Case as a Collective Action for Settlement Purposes Only, Approving the Settlement Agreement, Granting a Service Award, and Awarding Attorneys' Fees and Reimbursement of Expenses." (Doc. No. 23.) For the following reasons, Plaintiff's motion is granted.

**I.      BACKGROUND**

Taking the allegations in Plaintiff's Complaint as true, the facts are as follows.

A. **Factual Background**

Plaintiff was hired by Defendant in January 2020 as a Marketing Helper. (Doc. No. 1 at ¶ 31.) In this capacity, Plaintiff's primary duty "involved helping Defendants' employees and/or employees of Defendant's clients to conduct field market research activities." (*Id.* at ¶ 35.) The field market research was for "certain technological devices," and was conducted by "gathering relevant information through testing, interviews, surveys, and other in-person interactions with potential consumers." (*Id.* at ¶ 36.) Plaintiff would receive job assignments from Kadence, "who would determine which Marketing Helpers would be sent to which marketing studies, arrange their transportation, and set their work schedule." (*Id.* at ¶ 37.) Plaintiff would then travel to the testing locations in question, which were held either at participants' residences or commercial venues. (*Id.* at ¶ 38.) During the course of his employment as a Marketing Helper, Plaintiff performed a substantial percentage of his jobs within Pennsylvania, in addition to other cities across the United States, such as Atlanta, New York, and Boston. (*Id.* at ¶ 39.)

In November 2020, Plaintiff assumed the additional role of a Support Assistant, which he performed contemporaneously with his role as a Marketing Helper. (*Id.* at ¶ 32.) His duties as a Support Assistant "primarily involved clerical and/or low-level administrative tasks, such as cataloguing previous participants and researching and contacting potential new venues and office space for Defendant." (*Id.* at ¶ 42.)

Plaintiff alleges that he "received $160 per day when performing his role as Support Assistant, except when he was also performing field work that day [as a Marketing Helper], under which circumstances he would only receive his field day rate of $300 plus $25 per diem."[1]

---

[1] Plaintiff reports that when he began his position as a Marketing Helper, he was originally compensated on a day rate basis of $400 per working day, but that "in or around November 2020, following Plaintiff's return from a COVID-19 related business slowdown, Defendant began paying Plaintiff $300 per day, plus $25 per diem." (*Id.* at ¶¶ 41–42.) Before Defendant began paying Plaintiff per diem pay separate from

(*Id.* at ¶ 44.)  Plaintiff claims that he "typically worked between ten (10) and fourteen (14) or more hours per day, six (6) days per week," in his role as a Marketing Helper, and that he often worked additional hours in his role as a Support Assistant without receiving additional compensation.  (*Id.* at ¶¶ 49–50.)  Although Plaintiff regularly worked "more than forty (40) hours per week," he asserts that he did not receive any overtime compensation for overtime hours worked, because he was misclassified by Defendant as an independent contractor.  (*Id.* at ¶¶ 51–2.)  To this end, Plaintiff claims that he should have been characterized as a "non-exempt" employee under the FLSA and PMWA, because Defendant maintained significant control over the manner in which he and similarly situated individuals carried out their duties as Marketing Helpers and Support Assistants.[2]  (*Id.* at ¶¶ 54–61.)  Plaintiff continued working for Defendant until May 2021.  (*Id.* at ¶ 33.)

## B.    Procedural History

Plaintiff filed this collective action on March 22, 2022, alleging that Defendant had violated his and other employees' rights under the FLSA and PMWA[3] by misclassifying them as independent contractors, which resulted in the denial of overtime compensation.  (*Id.*)

---

his day rate, he received reimbursement for certain out-of-pocket travel expenses, in addition to Defendant paying for his flights, lodging, and car rentals.  (*Id.* at ¶ 45.)  But Defendant continued to pay for these costs and reimbursements even after it introduced per diem pay.  (*Id.* at ¶ 46.)

[2] Specifically, Plaintiff alleges that Defendant's Management Team instructed him in his capacity both as a Marketing Helper and as a Support Assistant.  (*Id.* at ¶ 55.)  Upon arriving at a worksite, Defendant's Management Team would hold meetings to provide the Marketing Helpers with instructions and an overview of the job.  (*Id.* at ¶ 47.)  The Management Team would supervise, oversee, and direct the work of the Marketing Helpers, assigning them specific tasks to perform throughout the day. (*Id.* at ¶ 48.)  Defendant also assigned the Marketing Helpers work schedules and controlled when they could leave for the day.  (*Id.* at ¶ 56.)  Plaintiff was also required to perform his work in accordance with specific guidelines, protocols, and trainings provided by Defendant.  (*Id.* at ¶¶ 57–59.)  He was not permitted to outsource his work or employ others.  (*Id.* at ¶ 60.)  Defendant also provided Plaintiff with tools and equipment needed for each job.  (*Id.* at ¶ 61.)

[3] Of the 93 collective members, only 27 individuals performed services for Defendant within the Commonwealth of Pennsylvania and seek relief under the PMWA.  (*Id.* at 5 n.1)

Thereafter, six individuals filed "Opt-In and Consent to Join" forms, expressing their intention to join this action as Opt-In Plaintiffs: Sarah Irving, Calida Howell, Briana Creeley, Katy Johnson, Haley Stokes, and Beau Bryan (together, with Mr. Brown, the "Plaintiffs"). (Doc. Nos. 3, 4, 6, 7, 12, 13.) On July 6, 2022, Defendant filed an Answer, acknowledging that Plaintiff and other putative collective members were paid on a day rate basis and did not receive overtime compensation but asserting that they had been properly classified as independent contractors. (Doc. No. 16.)

The parties subsequently engaged in limited discovery related to conditional certification of the proposed class. Plaintiffs were scheduled to file a motion for conditional certification and notice by December 9, 2022. (Doc. No. 20.) But on December 8, 2022, the Court received correspondence from the parties reporting that, following a full-day's mediation on October 14, 2022, with The Honorable Thomas J. Reuter (Ret.) of JAMS, they had reached a proposed settlement agreement. (Doc. No. 21.)

On February 3, 2023, Plaintiffs filed this "Unopposed Motion for an Order Certifying the Case as a Collective Action for Settlement Purposes Only, Approving the Settlement Agreement, Granting a Service Award, and Awarding Attorneys' Fees and Reimbursement of Expenses." (Doc. No. 23.) The Court held a hearing on the motion on March 6, 2023. (Doc. No. 24.)

C.     **The Proposed Settlement**

After "extensive arms' length negotiations," the parties agreed upon a "fair, adequate, and reasonable" compromise that will "avoid the uncertainty and cost of further litigation of this matter." (Doc. No. 23-1 at 6.) Subject to the Court's approval, Defendant has agreed to pay $220,000.00 to settle Plaintiffs' claims in accordance with certain terms (the "Proposed

Settlement").[4]  The funds will be allocated as follows:

- $122,468.00 (the "Settlement Fund") to the putative collective, to be distributed to up to 93[5] collective members on a *pro rata* basis, based on the degree of economic harm they experienced, as estimated by Plaintiffs' Counsel;

- $2,500.00 to Mr. Brown as an award for his service as class representative;

- $77,532.00[6] to Plaintiffs' counsel in attorneys' fees and costs; and

- $17,500.00 to the Claims Administrator's fees and costs.

(*Id.*)

Upon judicial approval of the Proposed Settlement, the parties' chosen Claims Administrator, RG/2 Claims Administration, LLC, will mail all 93 putative collective members

---

[4] The terms of the Proposed Settlement are memorialized in a settlement agreement (the "Settlement Agreement").  (Doc. No. 23-2, Ex. B.)

[5] Prior to the mediation with Judge Rueter, Defendant produced a spreadsheet known as the "IC Shift Data Spreadsheet" (Doc. No. 23-2, Ex. C), which originally contained payroll information for 99 individuals who Defendant initially identified as fitting within the definition of the putative collective proposed by Plaintiffs.  (Doc. No. 23-1 at 5–6.)  The parties subsequently decided to "refine the definition in the proposed collective to exclude those who did not work at least four (4) consecutive days for Defendant during any workweek from March 22, 2019 to May 30, 2022—the period of time for which Defendant has produced applicable pay records." (*Id.* at 14 n.8.)  This mutual decision was made "because such individuals very likely would not have worked enough hours during any one workweek (even assuming they worked twelve hours per day) to have been entitled to overtime compensation." (*Id.*)  Accordingly, the parties determined that six individuals had not worked a sufficient number of workdays to be owed overtime compensation pursuant to the damages calculation methodology. (*Id.* at 6 n.4.)  Thus, those six individuals were "excluded from the proposed settlement collective." (*Id.*)  Notably, the 93 remaining putative collective members and their corresponding pay data were identified by number, rather than by name, to preserve the confidentiality of those individuals' identities if the parties were unable to come to a resolution at the mediation.  (*Id.* at 7 n.5.)  Plaintiffs indicate that the identities of the remaining collective members "shall be revealed for purposes of notice and settlement administration upon the Court's approval of the Settlement."  (*Id.* at 7.)

[6] Specifically, Plaintiffs' counsel seeks $77,000.00 in attorneys' fees and $532.00 in litigation expenses. (*Id.* at 4.)  The total amount of $77,532.00 also does not include $4,300.00 that Defendant has already agreed to pay Plaintiffs' counsel as reimbursement for costs related to the October 14, 2022 mediation. (*Id.* at 4 n.1); (Doc. No. 23-1, Ex. B at 2, 14.)

an "Initial Settlement Payment Check." (Doc. No. 23-1 at 7); (Doc. No. 23-2, Ex. B. at 11.) The checks will be distributed from the Settlement Fund in the amount of the putative collective members' *pro rata* contribution to "the total estimated collective-wide damages in unpaid overtime compensation."[7] (Doc. No. 23-1 at 7.) Each individual has 75 days to sign and redeem the check, which will include the following disclaimer:

> CONSENT TO JOIN AND RELEASE OF CLAIMS By depositing, cashing, or otherwise negotiating this check, I voluntarily consent to join the Fair Labor Standards Act claims in this case Brown v. Kadence International, Inc. (E.D. Pa. Case No. 22-cv-01097-KSM) as a party plaintiff, and I expressly agree to be bound by the Settlement Agreement and release of claims in that case.

(*Id.*); (Doc. 23-2, Ex. B at 18.) The "Notice of Collective Action Settlement" (the "Notice") will also be enclosed with the members' Initial Settlement Payment Checks. (Doc. No. 23-2, Ex. B to Ex. B.) Thus, by redeeming their checks, putative collective members will join this case as Opt-In Plaintiffs ("Participating Settlement Class Members") and be bound by the Settlement Agreement and the release of claims. (Doc. No. 23-1 at 7); (Doc. No. 23-2, Ex. B. 17.) Plaintiffs' Counsel will then file redacted facsimiles of the negotiated Initial Settlement Payment Checks with the Court. (Doc. No. 23-1 at 7); (Doc. No. 23-2, Ex. B at 18 ("The filing of such checks shall be deemed to constitute valid notice of the Participating Settlement Class Member's decision to become a 'party plaintiff' in the Action, within the meaning of 29 U.S.C. § 216(b).").)

After 75 days, any checks that remain uncashed or undeposited will be voided. (Doc. No. 23-1 at 8); (Doc. No. 23-2 at 15.) Those who did not negotiate their Initial Settlement Payment Checks ("Non-Participating Settlement Class Members") will not be bound by the Settlement

---

[7] Each collective member is entitled to a minimum $50.00 payment; if a *pro rata* share is less than $50, then that individual will receive $50.00 and new *pro rata* shares will be calculated for the remaining collective members. (Doc. No. 23-2, Ex. B. at 11.)

Agreement or the release of claims.  (*Id.*)

Within 14 days after the expiration of the 75-day deadline to negotiate the Initial

Settlement Payment Check, the funds associated with any unclaimed checks shall be

redistributed, on a *pro rata* basis, to all Participating Settlement Class Members via "Residual

Settlement Payment Checks."  (Doc. No. 23-1 at 8); (Doc. No. 23-2 at 15.)  Participating

Settlement Class members will have another 75 days to sign and negotiate their checks before

they are voided.  (*Id.*)  Any remaining funds associated with uncashed or undeposited Residual

Settlement Payment Checks shall be distributed, *cy pres*, to the Pennsylvania IOLTA Board.

(*Id.*)

## II.    COLLECTIVE CERTIFICATION

### A.    Legal Standard

The FLSA allows an employee alleging an FLSA violation to bring an action on "behalf

of himself…and other employees similarly situated."  29 U.S.C. § 216(b).  This is known as a

"collective action."  Traditionally, courts approve FLSA collectives in a two-step process.  *See

Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012); *Wright v. Lehigh Valley

Hosp.*, Civil Action No. 10-431, 2010 WL 3363992, at *2 (E.D. Pa. Aug. 24, 2010).  At the first

stage, the court considers whether the collective should be conditionally certified for the purpose

of providing notice to collective members.  *See Halle v. W. Allegheny Health Sys. Inc.*, 842 F.3d

215, 224 (3d Cir. 2016).  Conditional certification requires "a modest factual showing" by which

"a plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between

the manner in which the employer's alleged policy affected her and the manner in which it

affected other employees."  *Zavala*, 691 F.3d at 536 n.4 (citing *Symczyk v. Genesis HealthCare

Corp.*, 656 F.3d 189, 193 (3d Cir. 2011)).

The second stage is known as "final certification," where the plaintiff bears the burden of establishing that the members of the proposed collective are "similarly situated" within the meaning of § 216(b).  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 85 (3d Cir. 2017); *Halle*, 842 F.3d at 226; *Zavala*, 691 F.3d at 537.  Courts consider several factors at this stage, including "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment."  *Zavala*, 691 F.3d at 536–37.  The Third Circuit "endorses an ad hoc approach to this analysis, considering all relevant factors and making a determination on a case-by-case basis as to whether the named plaintiffs have satisfied this burden by a preponderance of the evidence."  *Halle*, 842 F.3d at 226.

### B.      Analysis

Here, with the approval of Defendant, Plaintiffs seek certification via a "one-step" approval process, by which the Court, "after determining that members of the proposed settlement collective are in fact similarly situated," will review the settlement for "fairness." (Doc. No. 23-1 at 10.)  The parties contend this "one-step" approach is an effective way to proceed because the parties reached a settlement *before* Plaintiffs filed an initial motion for conditional certification and notice.  (*See* Draft H'rg. Tr. at 2:15–24.)  The Court agrees that, in the interest of judicial economy and administrative efficiency, this approach is appropriate in these circumstances.[8]

---

[8] Before a court can approve an FLSA collective action settlement, final certification of the collective is required.  *See Sawyer v. Health Care Sols. at Home, Inc.*, No. 5:16-CV-5674, 2019 WL 1558668, at *2 (E.D. Pa. Apr. 10, 2019) ("[T]he Court must complete the second stage of certification and grant final certification of the collective action before it can approve the settlement agreement.").  "Indeed, where the parties reach settlement *after* a court has conditionally certified a collective class, the court still must make some final class certification before approving a collective action settlement." *Cruz v. JMC Holdings, Ltd.*, No. CV169321KSHCLW, 2019 WL 4745284, at *3 (D.N.J. Sept. 30, 2019) (emphasis added) (quoting *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 993 (N.D. Ind. 2010)).  There is

### 1.      *Notice*

Although the Third Circuit has historically promoted a two-step certification process for FLSA collectives, it has also explained that the first step, conditional certification, "is not really a certification." *Zavala*, 691 F.3d at 536.  Rather, "[i]t is actually the district court's exercise of its discretionary power to facilitate the sending of notice to potential class members and is neither necessary nor sufficient for the existence of a representative action under the FLSA." *Id.* (cleaned up); *Halle*, 842 F.3d at 224 ("Conditional certification, therefore, is not a true certification, but rather an exercise of a district court's discretionary authority to oversee and facilitate the notice process.").  Thus, "the sole consequence of conditional certification is the dissemination of court-approved notice to potential collective action members." *Halle*, 842 F.3d at 224 (cleaned up).

Significantly, "[i]n order to be bound by a FLSA collective action settlement, potential class members must affirmatively 'opt in.'" *Keller v. TD Bank, N.A.*, No. CIV.A. 12-5054, 2014 WL 5591033, at *13 (E.D. Pa. Nov. 4, 2014) (citing *Lusardi v. Lechner*, 855 F.2d 1062, 1070–71 (3d Cir. 1988) ("The members of the class who opt-in receive the benefit of final judgment despite the action's non-binding effect on absent members.")).  If putative collective members choose not to opt in, they are permitted to bring a separate suit later. *See id.*  FLSA opt-in collectives stand in contrast to Rule 23 opt-out class actions, where class members are barred from relitigating their claims if they fail to affirmatively exclude themselves from the suit. *Id.*;

---

little guidance in the Third Circuit, however, on the applicability of the two-step certification process where the parties reach a settlement *before* the court has conditionally certified the FLSA collective. *See Owens v. Interstate Safety Serv., Inc.*, No. 3:17-CV-0017, 2017 WL 5593295, at *1 (M.D. Pa. Nov. 21, 2017) (approving FLSA settlement that was reached before motion for conditional certification was filed but failing to engage in certification analysis).  The Court is aware that districts in other circuits have adopted a one-step approach in these circumstances. *See, e.g., Mollett v. Kohl's Corp.*, No. 21-CV-707-PP, 2022 WL 4641081, at *2 (E.D. Wis. Sept. 30, 2022) ("A one-step settlement approval process is appropriate for FLSA collectives.").

*In re NFL Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 713 (E.D. Pa. 2014) ("Despite the potential benefits of class actions, their binding effect on absentee parties remains a significant concern.").  The same due process considerations at the notice stage in a Rule 23 class action are therefore not present at the notice stage in an FLSA collective action.  *See Keller*, 2014 WL 5591033 at *13 ("As a result, the Court in the FLSA collective action does not serve the same role as the guardian of the absentee class members' rights.").

In the absence of heightened due process concerns, and because the Third Circuit has noted that the first step of the certification test is "fairly lenient,"[9] *Zavala*, 691 F.3d at 535, the Court finds that Plaintiffs may satisfy their notice obligation by enclosing the Notice with each collective member's Initial Settlement Payment Check.[10]  (Doc. No. 23-2, Ex. B to Ex. B.)  To this end, the Court also finds that the form and content of the Notice meets the requirements for approval.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989) ("By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and

---

[9] In keeping with this leniency, some courts have allowed conditional certification to be achieved simply by approving a joint stipulation.  *See, e.g.*, *Johnson v. Free State Mgmt. Grp., LLC*, No. CV 20-197-KSM, 2021 WL 2711528, at *3 (E.D. Pa. July 1, 2021) (proceeding to final certification analysis after approving conditional certification via joint stipulation); *Pham v. Quadgen Wireless Sols., Inc.*, Civil Action No. 17-cv-2894, 2020 U.S. Dist. LEXIS 37985, at *3–4 (E.D. Pa. March 3, 2020), *report and recommendation approved and adopted*, May 12, 2020, Dkt. 17-CV-2894, Doc. No. 49 (same).

[10] Plaintiffs acknowledge that no court in our Circuit has adopted this one-step approval process in the context of a case that has settled *before* conditional certification.  (*See* Draft H'rg. Tr. 4:10–15.)  But they cite several cases within the Third Circuit where, *after* conditional certification, the court approved a settlement procedure where the notice of settlement is enclosed with the putative class member's settlement check, which the member may choose to endorse and negotiate to participate in the settlement.  *See Bellan v. Cap. Blue Cross*, No. 1:20-CV-00744, 2022 WL 736441, at *2, 9 (M.D. Pa. Mar. 10, 2022) (approving opt-in procedure where each member of the collective will be mailed a settlement check and notice, "including those who have not previously opted into the lawsuit," and will assent to the settlement agreement by negotiating their check); *Pham*, 2020 U.S. Dist. LEXIS 37985, at *15 (approving FLSA settlement where collective members were mailed settlement checks that, upon redemption, would release claims against defendant); *Fein v. Ditech Fin., LLC*, No. 5:16-CV-00660, 2017 WL 4284116, at *3, 11 (E.D. Pa. Sept. 27, 2017) (approving settlement process whereby putative collective members "opt in" by negotiating settlement check).

informative.").  The Notice will be mailed to all 93 members of the putative collective, who have

been identified by the parties by way of an agreed-upon damages methodology.  (Doc. No. 23-2,

Ex. B. at 14.)  Further, the Notice explains, in plain language, what this case is about, what the

terms of the settlement are, and how members of the collective will receive their money in a

potentially dual-installment process.  (Doc. No. 23-2, Ex. B to Ex. B.)  Importantly, the Notice

also explains that this is an "opt-in" settlement, by which a putative collective member can

choose not to redeem their Initial Settlement Payment Check and therefore be excluded from the

settlement's release of claims.  (*Id.*)  The Notice also provides information about who class

counsel are, how they can be contacted, and how they will be paid, as well as information about

the service award payment that will be made to Mr. Brown.  (*Id.*)  Moreover, it instructs

collective members to contact Plaintiffs' counsel with any questions.  (*Id.*)  For these reasons, the

Court approves the parties' Notice.

### 2.    *Similarly Situated*

To proceed with final certification of the proposed collective, the Court must also

determine whether Plaintiffs have established that the members are "similarly situated" within

the meaning of § 216(b).  *See Karlo*, 849 F.3d at 85; *Halle*, 842 F.3d at 226; *Zavala*, 691 F.3d at

537.  Here, the Court finds that Plaintiffs have carried their burden.  Although the putative

collective members worked for Defendant "at various worksites across at least 15 states," they

all performed the same role: "field-based marketing support and/or administrative assistance for

Defendant's market research projects."  (Doc. No.23-1 at 13–14.)  As such, they had similar

salaries and circumstances of employment, as they were all paid "on a day rate basis."  (*Id.* at

14.)  They all advance the identical claim that they were misclassified by Defendant as

independent contractors, and as a result, were not appropriately compensated.  (*Id.*)  Finally, they

all seek the same form of relief for this claim: compensation for unpaid overtime wages.  (*Id.*)
For these reasons, the Court is satisfied that the putative collective members are "similarly
situated" to Mr. Brown.

*  *  *

The Court is satisfied that Plaintiffs will provide sufficient notice to the putative class
members of the resolution of this action, and that the putative class members are so "similarly
situated" to warrant collective relief under the FLSA.  For the above-stated reasons, the Court
will grant final certification.

## III.    THE SETTLEMENT

### A.    Legal Standard

Courts considering whether to approve settlement of an FLSA action follow a three-step
process.  *See DiFlavis v. Choice Hotels Int'l, Inc.*, Civil Action No. 18-3914, 2020 WL 6728806,
at *2 (E.D. Pa. Nov. 16, 2020).  First, the court considers whether "the settlement concerns a
'bona fide dispute.'"  *Id.* (quoting *Howard v. Phila. Hous. Auth.*, 197 F. Supp. 3d 773, 777 (E.D.
Pa. 2016)).  If it does, the court then considers whether the settlement is "fair and reasonable for
the employees."  *Id.*  And finally, the court considers whether the settlement "furthers the
FLSA's implementation in the workplace."  *Id.*

In determining whether there is a "bona fide dispute" between the employees and the
employer, courts consider whether the dispute involves legal or factual issues, "such as FLSA
coverage or computation of back wages."  *Lynn's Food Stores, Inc. v. U.S. Dep't of Labor*, 679
F.2d 1350, 1354 (11th Cir. 1982); *see also Bettger v. Crossmark, Inc.*, Civil Action No. 1:13-
CV-2030, 2015 WL 279754, at *4 (M.D. Pa. Jan. 22, 2015) ("An agreement resolves a bona fide
dispute when there is some doubt as to whether the plaintiff would succeed on the merits at

12

trial."). A bona fide dispute exists when "the dispute ... fall[s] within the contours of the FLSA and there [is] evidence of the defendant's intent to reject or actual rejection of th[e] claim when it is presented." *Kraus v. PA Fit II, LLC*, 155 F. Supp. 3d 516, 530 (E.D. Pa. 2016).

In determining whether a settlement is fair and reasonable, courts in the Third Circuit use the factors identified by the Third Circuit in *Girsh v. Jepson* to evaluate whether a class action settlement is fair and reasonable. *See DiFlavis*, 2020 WL 6728806, at *3; *In re Chickie's & Pete's Wage & Hour Litig.*, Civil Action No. 12-6820, 2014 WL 911718, at *2–3 (E.D. Pa. Mar. 7, 2014). *But see Kraus*, 155 F. Supp. 3d at 523 n.3 (observing that some of the *Girsh* factors do not apply in the context of FLSA settlements and that "though *Girsh* may suggest the type of factors to be considered in assessing a private FLSA settlement, courts need not fall into the alluring trap of mechanically applying *Girsh* simply because it is the court's duty to assess whether the proposed agreement is fair and reasonable.").

And finally, in determining whether the settlement advances the purposes of the FLSA, courts consider factors such as whether the settlement agreement is narrowly tailored such that it resolves only the employees' wage and hour claims and whether the agreement contains a confidentiality clause that would frustrate the FLSA's "informational objective." *In re Chickie's & Pete's*, 2014 WL 911718, at *3; *DiFlavio*, 2020 WL 6728806, at *7–8.

### B.    Analysis

The Court considers whether the Proposed Settlement satisfies each of the three requirements for approval in turn below.

#### 1.    *A Bona Fide Dispute*

The Proposed Settlement resolves a bona fide dispute between the parties. The factual and legal issues in this case concern whether Defendant misclassified Plaintiffs as independent

contractors rather than non-exempt employees, and whether Plaintiffs are entitled to overtime compensation due to this misclassification.  (Doc. No. 1 at ¶ 81); (Draft H'rg. Tr. 22:21–23:2 ("Q: Can you take me through the factual and legal issues in this case[?] … A: So the bona fide dispute is primarily regarding two things: independent contractor misclassification and hours worked.").)  In response to Plaintiffs' allegations, Defendant denied all liability and raised several affirmative defenses that could have limited Plaintiffs' recovery, namely, that Plaintiffs' claims were barred in part by the applicable statute of limitations and whether liquidated damages were available under the FLSA.  (Doc. No. 16 at ¶ 81, pp. 6–12); (Doc. No. 23-1 at 20.) Defendant also maintained that Plaintiffs had been properly classified as independent contractors and were not subject to the FLSA's minimum wage and overtime requirements.  (Doc. No. 16 at ¶¶ 25, 42, 51.)

Considering these areas of disagreement, the Court is satisfied that the Proposed Settlement resolves a bona fide dispute between the parties.  *See Johnson*, 2021 WL 2711528, at *5 (finding a bona fide dispute existed where plaintiff and defendant disagreed over whether plaintiff should have been classified as an employee rather than as an independent contractor); *Wahpoe v. Staffmore LLC*, No. CV 19-1268, 2020 WL 5554413, at *3 (E.D. Pa. Sept. 16, 2020) (same); *Kauffman v. U-Haul Int'l, Inc.,* No. 5:16-CV-04580, 2019 WL 1785453, at *3 (E.D. Pa. Apr. 24, 2019) (same); *Lyons v. Gerhard's Inc.*, No. CIV.A. 14-06693, 2015 WL 4378514, at *4 (E.D. Pa. July 16, 2015) (same).

### 2.    *Fair and Reasonable*

The Court also finds that the Proposed Settlement is fair and reasonable.  In *Girsh v. Jepson*, the Third Circuit set forth nine factors that courts should consider in determining whether a settlement is fair and reasonable. 521 F.2d at 157. The *Girsh* factors are:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risk of establishing damages; (6) the
> risk of maintaining the class action through the trial; (7) the ability
> of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

*Id.* (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)) (cleaned up).

An analysis of these factors supports a finding that the Proposed Settlement is fair and

reasonable.

   *Factor 1: Complexity, Expense, and Likely Duration of Litigation.*  This factor weighs in

favor of granting approval of the settlement.  Here, the parties reached a settlement agreement

prior to conditional certification, thereby avoiding motion practice on this issue and any

challenge to certification.  (Doc. No. 23-1 at 15.)  Achieving a settlement early in the litigation

process also obviated the need for "protracted discovery" on final certification, liability, and

damages, "which would have included extensive written discovery and the taking depositions of

Defendants' ownership and management." (*Id.* at 16.)  Further, the parties indicated that they

likely would have engaged in significant additional motion practice, "with Plaintiff potentially

moving to certify this case as a Rule 23 class action under the PMWA, and Defendant moving to

decertify the collective action and both sides filing motions for summary judgment." (*Id.*)

Finally, the parties indicate that trial would have been expensive and time-consuming for both

sides because of the complex factual and legal issues involving 93 individuals.  (*Id.*)

Accordingly, this factor weights in favor of approving the Proposed Settlement.  *See Kyem v.*

*Merakey USA,* No. 2:19-CV-05577-KSM, 2022 WL 425584, at *3 (E.D. Pa. Feb. 11, 2022)

(determining that the first factor weighed in favor of approval where the parties would have to

conduct additional discovery and were likely to engage in extensive motions practice); *Wood v. Saroj & Manju Invs. Phila. LLC*, CIVIL ACTION NO. 19-2820-KSM, 2021 WL 1945809, at *7 (E.D. Pa. May 14, 2021) (same).

 *Factor 2: Reaction of Plaintiffs.*  Plaintiffs' counsel reports that neither Mr. Brown, nor any of the Opt-In Plaintiffs, have raised objections to the settlement, and that "several have expressly communicated their approval of the settlement." (*Id.*)  Usually, the lack of objections to the Settlement Agreement weighs strongly in favor of approving the Proposed Settlement. *See Kyem*, 2022 WL 425584, at *4 (citing *In re SmithKline Beckman Corp. v. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990)).  But in these circumstances, where putative collective members will receive *post hoc* notice of the Settlement Agreement via the "one-step" approval process, the Court cannot accurately assess whether there are any putative members of the collective who might object to the Agreement's terms.  For this reason, the Court concludes that this factor is neutral.

 *Factor 3: Stage of Proceedings.*  The relevant question in assessing this factor is "whether counsel had an adequate appreciation of the merits of the case before negotiating" the settlement. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004).  Although the parties reached a settlement early in the litigation, the parties nevertheless "engaged in the exchange and analysis of voluminous payroll data and multiple discussions regarding the nature and constitution of the proposed collective, Defendant's defenses to Plaintiff's and the putative collective's claims, and Defendant's timekeeping and/or payroll practices." (Doc. No. 23-1 at 18.)  Plaintiffs' counsel also spoke with Mr. Brown and the Opt-In Plaintiffs regarding their individual experiences to assess the degree to which they were impacted by the alleged violations asserted in this suit. (*Id.* at 19.)  Upon a thorough review of Defendant's payroll records,

16

Plaintiffs' counsel conducted a detailed calculation of the overtime wages owed to each member of the putative collective.  (*Id.*)  In light of this extensive preparation, the Court finds that this factor also weighs in favor of approval of the Proposed Settlement.

Factors 4, 5, and 6: Risks of Continued Litigation.  As discussed in our assessment of the parties' bona fide dispute, *see supra* Section III.B.1, certain factual deficiencies in Plaintiffs' case and legal defenses available to Defendant would have posed a significant risk to establishing liability and damages.  Plaintiffs would have been required to prove that they, and the members of the putative collective, were misclassified as independent contractors.  Plaintiffs admit, however, that "in the absence of accurate recordkeeping,"[11] it would have been difficult to calculate that exact the number of hours for which overtime wages were owed.  (Doc. No. 23-1 at 20.)  Plaintiff would also have had to prove entitlement to liquidated damages under the FLSA, and the applicability of a three-year statute of limitations under the FLSA, both of which were disputed by Defendant.  (*Id.*)  Plaintiffs also indicate that there was some risk that Defendant could have avoided collective liability if the Court had denied a motion for conditional certification, or if Defendants had been successful in filing a motion for decertification.  (*Id.*)  To this end, Plaintiff acknowledges that if the case had not settled at this early stage, Defendant may have succeeded at decertification, summary judgment, or trial, thereby undercutting any potential at recovery for the putative collective members.  (*Id.*)  Considered together, these uncertainties weigh in favor of approving the settlement.

---

[11] Because Defendants believed Plaintiffs were properly classified as independent contractors, Defendant did not track and record the number of days per calendar week, or the daily and weekly hours, worked by the putative collective members.  (*Id.* at 22 n.10.)  Therefore, "it is not possible to accurately determine the amount of overtime compensation owed to Settlement Class Members for each workweek in the liability period."  (*Id.*)  Defendant did, however, keep records of the days worked by, and amounts paid to, the putative collective members during each invoicing period (approximately two weeks) or per project.  (*Id.*)  So, it is possible to determine which putative collective members worked more days, and therefore more hours, than others.  (*Id.*)

*Factor 7: Ability of Defendant to Withstand a Greater Judgment.*  Plaintiffs offer no argument in support of this factor, except to note that "the determination that a Defendant could withstand a greater judgment does not carry much weight in evaluating the fairness of the settlement." (*Id.* at 21 (quoting *Hoffman v. Wells Fargo & Co.*, 2013 U.S. Dist. LEXIS 189337, 10 (E.D. Pa. Feb. 7, 2013) (cleaned up).)  Thus, the Court concludes that this factor is neutral.

*Factors 8 and 9: Range of Reasonableness.*  Under the Proposed Settlement, each collective member will receive a *pro rata* share of the Settlement Fund in their Initial Settlement Payment Check, based on Plaintiffs' counsel's estimate of the economic harm they experienced. (Doc. No. 23-1 at 21–22.)  This estimate assumes the applicability of a three-year "willful" violation "lookback period" under the FLSA statute of limitations (at a ratio of 11 hours per workday) and assumes that all workdays recorded by Defendant during each invoicing cycle or project were worked in consecutive increments of six days.[12] (*Id.*)  Using these assumptions, Plaintiffs' counsel estimates that the total collective-wide damages in this matter are approximately $223,500.00. (*Id.*)  The total Proposed Settlement (including the Settlement Fund, Service Award, and attorneys' fees and costs) is $220,000.00, which roughly correlates to this estimate.  Accordingly, the first payment contained in the Initial Settlement Payment Check will amount to approximately 55% of the maximum amount of unpaid overtime compensation owed to each member of the collective. (*Id.*)  Plaintiffs' counsel has calculated that the average Initial Settlement Payment Check will be approximately $1,317.00. (*Id.* at 24 n.12.)  Further,

---

[12] These assumptions related to the putative collective members' working hours are made in favor of Plaintiffs' and provide greater recovery than the putative collective members' might otherwise be entitled to if there were accurate records of daily and weekly hours worked. (*Id.* at 22 n.10.)  The parties have assumed that "all reported workdays in an invoicing period are worked consecutively up until the sixth (6) day, after which a new forty-hour 'workweek' for purposes of calculating overtime begins." (*Id.*)

because the Proposed Settlement provides for a *non-reversionary*[13] Settlement Fund, any

unredeemed Initial Settlement Payment Checks will be redistributed among the members.  (*Id.* at

22.)  As a result, the members will likely receive more than the expected 55% initial recovery.[14]

(*Id.*)  Having reviewed this proposed payment plan, Court finds that this final factor weighs in

favor of approval.

In sum, seven of the nine *Girsh* factors weigh in favor of approval, and none of the

factors weigh against approval.[15]  For these reasons, the Court finds that the Proposed Settlement

is fair and reasonable.

---

[13] Meaning, "all the money will be paid out and none will revert to [defendant]."  *Myers v. Jani-King of Phila., Inc.*, No. CV 09-1738, 2019 WL 4034736, at *2 (E.D. Pa. Aug. 26, 2019).

[14] During the hearing, Plaintiffs' counsel indicated that, in his experience, the usual rate of opt-in participation in FLSA collective actions is about 15–30%, and that even if this settlement receives double that participation, the Participating Settlement Class Members will still receive almost full recovery. (Draft H'rg. Tr. 13:14–23 ("I believe the statistics for opting into a non-settlement collective action, the rates are generally around 15 to 30 percent I think.  Let's assume that it's going to be double that, so 30 to 60 percent for settlement—and I don't have any cases to cite for that—but just saying, I would assume, based on that, that an additional, let's say 30 or 40 percent will get added if not more during the second round of checks.  So in all likelihood, people who decide to join this case will end up receiving very close to the full amount that they could recover.").)  Therefore, Plaintiffs' counsel estimates that even if as many as 60% of the collective negotiates the initial settlement checks, it is likely that those Participating Settlement Class Members will receive 100% or more of their eligible recovery.  (*Id.* 31:3–21 ("Q: So with your numbers you said opt in, in a non-settlement 15 to 30 percent, if it's a settlement, let's double it and say 30 to 60 percent.  So we're going to go with the high end.  60 percent of people negotiate that first check, okay?  Then we are going to go give them another check.  A: Yeah.  Q: By the time they get both checks, and this is—we're only dealing with $122,000.  A: Yes.  Q: You think that would come close to a hundred percent for those 60 percent of the class?  A: I do believe that would be the case.  Obviously, one of the things that will affect that is who opts in if we have individuals who unfortunately don't receive the notice but have a higher amount attributed to them.  You can have even a higher percentage than 60 percent.").)

[15] Plaintiffs' counsel emphasizes that "the view of experienced counsel favoring settlement is entitled to considerable weight."  (*Id.* at 15 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004).)  Plaintiffs' counsel assert that this settlement is proposed by "experienced and reputable counsel," and that "[b]ased on their experience with this type of litigation, it is [their] view that the Settlement represents a fair, reasonable, and adequate resolution of this case in light of the risks and costs associated with continued litigation."  (*Id.* at 24.)

### 3.  Purposes of the FLSA

The Court must consider whether the Proposed Settlement furthers the purposes of the FLSA.  Importantly, there is no confidentiality clause in the Settlement Agreement.  *See DiFlavis*, 2020 WL 6728806, at *6 (explaining that "confidentiality clauses in FLSA settlement agreements frustrate the purpose of the Act by restricting information").  Further, the Settlement Agreement's "Specific Waiver and Release by Participating Settlement Class Members" provision requires the members of the collective to waive only their FLSA and state law wage and hour-related claims against Defendant during the class period.  (*See* Doc. No. 23-2, Ex. B at 17–18.)  Accordingly, this release, which applies to all Participating Settlement Members, is appropriately and narrowly tailored.[16]  *See DiFlavis*, 2020 WL 6728806, at *6.

\*   \*   \*

The Court finds that the Settlement Agreement is a fair and reasonable compromise to the parties' bona fide dispute under the FLSA.  For the above-stated reasons, the Proposed Settlement will be approved.

## IV.   THE SERVICE AWARD

We will also approve the $2,500.00 service award to Mr. Brown.  Service payments are a common feature of collective action settlements.  *See Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011).  These payments serve "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of [the] litigation and to reward the public service of contributing to the enforcement of mandatory laws."  *Id.* (cleaned up).  "There is

---

[16] The Settlement Agreement also includes a "General Waiver and Release of All Claims by Named Plaintiff" provision, which applies only to Mr. Brown.  (Doc. No. 23-2, Ex. B. at 16.)  The release precludes Plaintiff from raising "any and all" claims "for any event or occurrence from the beginning of time up through the execution of this Agreement."  (*Id.*)  This release, to which Mr. Brown has no objection, is in exchange for Mr. Brown's service award.  (*See* Draft H'rg. Tr. 25:16–26:3.)

substantial precedent from [the Third] Circuit supporting approval of incentive payments." *See Somogyi v. Freedom Mortg. Corp.*, Civil No. 17-6546, (RMB/JS), 2020 WL 6146875, at *9 (D.N.J. Oct. 20, 2020) (collecting cases).

Here, the proposed service award is reasonable.  Mr. Brown has been "actively involved in this litigation since before it was commenced."  (Doc. No. 23-1 at 25.)  He provided information and documents to Plaintiffs' counsel and met with Plaintiffs' counsel on multiple occasions to describe details about his work experience with Defendant, such as his job duties and Defendant's recordkeeping practices and compensation policies.  (*Id.*)  Mr. Brown also spoke with several of his former coworkers regarding their potential claims, resulting in their addition to this lawsuit as Opt-In Plaintiffs and the strengthening of Plaintiffs' position.  (*Id.*)  Further, Mr. Brown attended the full day's mediation with Judge Rueter at which the Proposed Settlement was reached and has assisted Plaintiffs' counsel in finalizing the Settlement Agreement.  (*Id.*)  Also, in undertaking this case as the Lead Plaintiff, Mr. Brown assumed the risk of being associated with a collective action lawsuit against a former employer, which may impact his future employment opportunities.  (*Id.* at 26.)  In exchange for this award, Mr. Brown has agreed to a general waiver of "any and all" claims against his former employer.  (*See* Doc. No. 23-2, Ex. B. at 16); (Draft H'rg. Tr. 25:16–26:3.)  Finally, the proposed service award is relatively small.  The $2,500.00 payment represents roughly 1% of the total recovery in this matter.  (Doc. No. 23-1 at 25.)  Courts have regularly approved similar service awards in FLSA cases. *See Young v. Tri Cnty. Sec. Agency, Inc.*, Civil Action No. 13-5971, 2014 WL 1806881, at *8 (E.D. Pa. May 7, 2014) (approving an incentive award that was approximately 3.5% of the class's total recovery).

For these reasons, the Court approves the proposed payment of $2,500.00 to award Mr.

Brown for his service as the named plaintiff.

## V.    ATTORNEYS' FEES AND COSTS

### A.    Legal Standard

In the Third Circuit, courts generally favor using the percentage-of-recovery method to compensate counsel in cases brought under the FLSA or state wage and hour laws as a collective action.  *See Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 765 (E.D. Pa. 2016). This is because the percentage-of-recovery method encourages efficiency and "rewards counsel for success and penalizes it for failure."  *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998) (quoting *In re Gen. Motors Corp.*, 55 F.3d at 821).  In determining whether the requested fees are reasonable under the percentage-of-recovery method, the Court considers seven factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections ... to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case; and (7) awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

The Third Circuit has also recommended that courts cross-check an award of attorneys' fees with the lodestar method, which requires the court to compare the attorneys' recovery under the percentage-of-recovery method with the "lodestar." *Id.*  The lodestar is calculated by "multiplying the number of hours [the attorney] reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer."  *Id.*  "The [lodestar] crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."  *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).  "[W]hen the multiplier is too

great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id.* (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005)).

### B.   Analysis

Plaintiffs' counsel seeks $77,000.00 or 35% of the settlement amount, in attorneys' fees and $532.00 in costs.  (Doc. No. 23-1 at 6, 27.)  At this time, the Court will take Plaintiffs' counsel's request for attorneys' fees under advisement.  Because the Court has allowed the parties to proceed with a novel "one-step" settlement approach, it will postpone consideration of attorneys' fees until the Court can assess the degree of opt-in participation in the settlement and the effectiveness of the Notice.  In accordance with the terms of the Settlement Agreement, Plaintiffs' counsel shall file the redacted facsimiles of the negotiated checks with the Court after the initial 75-day redemption period, at which point Plaintiffs' counsel may then supplement any arguments in support of the requested fee amount.

## VI.   CONCLUSION

For the reasons above, Plaintiffs' "Unopposed Motion for an Order Certifying the Case as a Collective Action for Settlement Purposes Only, Approving the Settlement Agreement, Granting a Service Award, and Awarding Attorneys' Fees and Reimbursement of Expenses" (Doc. No. 23) is granted in part.  Plaintiffs' counsel's request for attorneys' fees remains under advisement.  An appropriate Order follows.